[No. 19140. *En Banc.* October 21, 1926.]

HUNTER LAND COMPANY, *Appellant,* v. GEORGE F. LAUGENOUR *et al., Respondents.*[1]

[1] WATERS AND WATERCOURSES (9)—APPROPRIATION—TIME OF VESTING RIGHTS. Under the rule that the time of the actual diversion of water for a beneficial use relates back to the beginning of the work where the work has been pursued with reasonable diligence, where a settler on unsurveyed land, not subject to entry, makes improvements and uses water and sells out to another, he is not a mere squatter abandoning the land; and the rights of his successor in the use of water of the stream relate back to the date of the first appropriation.

[2] SAME (10)—APPROPRIATION—SUCCESSIVE APPROPRIATIONS AND PRIORITIES THEREOF. One who has assisted in the construction of a ditch to be used by another and also himself in the irrigation of lands, and who abandons any claim thereto and makes his own diversion through an independent ditch, cannot thereafter claim any right to the water in the first ditch.

[3] SAME (11)—APPROPRIATION—EFFECT AS AGAINST PRIOR RIPARIAN PROPRIETORS. Water may be taken by appropriation for use on land non-riparian to the stream and riparian owners have no

[1]Reported in 250 Pac. 41.

right superior thereto as to the water in the stream, which are in excess of the amount that could be beneficially used by the riparian owner.

[4] SAME (11). As between appropriators of water in a stream for use on non-riparian lands, the first in time is first in right; but rights depending upon riparian ownership are co-equal, notwithstanding the initiatory settlement of the one antedated another; and waters in excess of the needs of riparian owners, are subject to appropriation for non-riparian lands.

[5] SAME (27)—RIPARIAN RIGHTS—EXTENT OF RIGHT—IRRIGATION. Upper riparian owners have no right to the use of the water of the stream for irrigation in excess of the actual needs of the land; irrigation being an extraordinary use common to all riparian owners and not a natural one entitling an owner to its exclusive use, as for domestic purposes, such as drinking, washing, or for stock.

[6] SAME (11, 21)—APPROPRIATION—PRIORITIES BETWEEN APPROPRIATORS AND RIPARIAN OWNERS—APPORTIONMENT—JUDGMENT. In the apportionment of water for irrigation between riparian owners and appropriators, riparian claimants prior in the time of their settlement, are first in right and entitled to such proportion of the water as their riparian lands bear to the quantity of riparian lands on the stream capable of being irrigated therefrom, to the extent of the water necessary for such irrigation; and subsequent appropriators are entitled to the excess waters in the order of their actual appropriation and devotion of the same to a beneficial use.

Appeal from a judgment of the superior court for Stevens county, Neal, J., entered July 9, 1924, in favor of the defendants, in an action to determine the right to the use of the waters of a stream for irrigation. Modified.

*Wakefield & Witherspoon* and *Williamson & La Berge,* for appellant.

*Francis A. Garrecht, W. H. Jackson, Carroll B. Graves,* and *Wentz A. Bailey,* for respondents.

. FULLERTON, J.—This controversy involves the rights of the various claimants to the waters of a stream known as Hunter creek. The stream is in the south-

western part of Stevens county. It has its source in the highlands lying between the Colville valley and the basin of the Columbia river, from whence it flows in a westerly direction into the river named. The last ten miles of its course is through a valley of varying width, containing some 1,040 acres of land capable of irrigation from the stream. The lands of the valley, while in an arid belt, are capable, when irrigated, of producing a variety of crops, such as fruit, cereal, forage and vegetable. The quantity of water flowing in the stream varies with the seasons. Measurements taken in the irrigating season showed that the quantity varied from one hundred inches per second of time at the beginning of the season to two feet per second of time at its close.

The earliest settlements in the valley were made in the year 1880. From that time on, the settlements were more or less rapid until, at the time of the hearing of the present controversy, all of the land in the valley capable of being irrigated from the stream was in private ownership. The first of the settlers early began taking water from the stream for irrigating purposes. The subsequent settlers also took water therefrom for like purposes, so that, at the time of the hearing, seventeen ditches were operated conveying water from the stream to the irrigable land. The quantity of water flowing in the stream at the beginning of the irrigating season is sufficient to supply the necessities of all of the land; but as the season advances and the needs become greater, it is insufficient, with the result that the water is absorbed by the proprietors of the upper reaches of the stream.

One James T. Hunter was among the first of the settlers in the valley. It is from him that both the creek and the valley take their names. He settled in

the fall of the year 1880. In that year, he built a house and a barn near the stream and took up his residence in the house. In the following year, he began to clear and fence the land he claimed. It is possible that his earlier efforts in this direction were not rapid, but he seems to have grown a garden on the land in the year following his settlement, and in 1883, he had some fifteen acres of it into grain. His settlement was on the lower reaches of the stream. In the following year, one Sogle settled on land bordering the stream near the settlement of Hunter. Sometime after his settlement, he and Hunter constructed a ditch from the stream to Sogle's claim, known in the record as the Garden ditch. Sogle, in the same year, also began the construction of a ditch from a point higher up the stream, known in the record as the upper Sogle ditch. It seems that there was an understanding between Hunter and Sogle that Hunter should have the right to extend these ditches onto his own claim; but before any extensions were made, a difficulty arose between them, causing Hunter to abandon any claim to the ditches. Hunter thereupon went higher up the stream and began the construction of a ditch of his own. This was in the year 1883. In the fall of that year, he completed the ditch for some one-fourth of a mile and turned water from the stream into it. In the next year he caused the extension of the ditch to be surveyed and continued the work of construction, finally completing it and bringing water to his land in the year 1885.

The appellant in the present action, The Hunter Land Company, is the successor in interest of James T. Hunter. On October 4, 1909, it began an action in the superior court of Stevens county, making the respondents Laugenour the sole defendants, in which it averred that it had a prior and superior right to the waters of the stream, that the defendants named were

wrongfully interfering with its right, and sought to have them restrained from so interfering, and to have its right in the waters of the stream adjudicated and quieted. On June 4, 1911, it, by leave of court, amended its complaint, making all of the water users on the creek defendants in the action, and making the same claims and seeking the same relief as against all of such users as it made and sought against the defendants Laugenour. For reasons not material here to state, the action was not brought on for trial until June 23, 1921. On that date the parties then appearing in the proceedings stipulated

" . . . that the superior court may refer the above entitled case to the supervisor of hydraulics, and that, when so referred, the said supervisor of hydraulics shall have all of the power and authority vested in him by ch. 117, Session Laws of the state of Washington, 1917, p. 447, known as the water code; that the supervisor of hydraulics shall survey and investigate the stream system of Hunter creek, take testimony and render a report on the same in the manner provided in said water code and with like effect as in cases initiated under said water code."

Pursuant to the stipulation, each of the claimants filed in the cause a verified statement of his claim, in the form prescribed by sec. 17 of the code named, whereupon the court made the order of reference to the state supervisor of hydraulics as stipulated. The supervisor thereupon surveyed the stream, took the evidence of the several parties, and in due time reported his findings and conclusions to the court.

The supervisor in his report found the date of the first settlement on the stream under which each several claimant derived his right, found the date of the first appropriation of the waters of the stream for use upon the land, found the number of cubic inches of

water per second of time necessary to successfully irrigate each acre of land, and described the land of each of the claimants. He divided the claimants into twenty different classes, and determined their priorities as he found them to be prior in time. Into the first class, he placed all of the water users who derived their rights through the Garden ditch and the upper Sogle ditch. Into the second class, he placed the appellant land company, finding it to be the successor in interest of James T. Hunter, and finding that Hunter's appropriation was subsequent only to the claimants deriving rights through the two ditches above mentioned. The remaining claimants, also, he grouped as he found they were prior in right.

Exceptions were taken to the supervisor's report, and a hearing was had thereon before the superior court on the facts as reported by the supervisor. That court made some radical changes in the classification of the supervisor. It reduced the number of the classes to four only. In its first class, it placed all of the claimants the supervisor had placed in his first class and added thereto four claimants from the supervisor's third class, three from the supervisor's eighth class and two from the supervisor's tenth class. It placed the appellant in its second class. Into its third and fourth classes, it grouped all of the remainder of the claimants, placing some eighteen of them in its third class and some four in its fourth class. It decreed that the claimants had priority to the use of the waters of the stream in accordance with their classification; those in each class having equal rights, and the higher classes having rights superior to those below them. From the decree of the court, the Hunter Land Company alone appeals.

The supervisor classified the claimants in the order that they or their predecessors in interest appropriated

the waters of the stream to a beneficial use. He gave no heed to riparian rights, finding with regard thereto that the "doctrine of appropriation has at all times been recognized by custom in this locality." The trial court made no specific findings of facts, and the principle it followed in making its classification can be known from the record only as it is reflected in its decree. The decree shows that the court, as to certain of the claimants at least, recognized the doctrine of riparian ownership as applicable to the locality. In the decree is also recited the date of settlement of the several claimants on the stream and the date the waters thereof were first applied to a beneficial use on their lands, and it appears from this that those of the claimants whom it advanced from a class lower than the appellant, as the supervisor made the classification, to a class higher than the appellant, had claims (with one exception only presently to be noticed) in virtue of prior settlements only. In other words, it decreed that the claimants who deraigned title from settlements on the stream made prior in time to the appropriation under which the appellant's claim was made, had, in virtue of their riparian rights, a right to the use of the waters for irrigation superior to the right of the appellant. It decreed, furthermore, that this riparian right to use the water for irrigation purposes applied to the full extent of the irrigable land of the riparian owner.

The court also in its decree fixed the time of the appropriation under which the appellant claims as of the year 1885, whereas the supervisor fixed it as of the year 1883. As the determination of the date affects the rights of certain of the parties to the proceeding, it is necessary that we notice it. It is our opinion that the decided preponderance of the evidence is with

the supervisor.   Something of the history of the mat-
ter we have hereinbefore set out.   The evidence leaves
but little doubt that the construction of the ditch by
which the water was diverted was commenced in the
year 1883 and completed in the year 1885.

[1]   The rule is that, when the actual diversion of
water to a beneficial use on land is at a time later than
the work of constructing the means by which it is di-
verted is begun, the time of diversion relates back to
the beginning of the work only when the work has
been pursued with reasonable diligence, so that the real
question is, was the work in this instance pursued with
reasonable diligence.

It is our opinion that it was.   The ditch was some
two and one-half miles in length, and for a part of the
way it required the construction of a flume.   The
work of construction was thus of considerable magni-
tude, and it would seem that, from the very nature of
the work, there was no lack of diligence.   In addition
to this, it was shown that Hunter was industrious and
energetic, and devoted his entire time to the work of
developing his property.   We have not overlooked the
argument made in this connection to the effect that
Hunter did not actually divert the water to his land
until the year 1886, but the evidence to our minds does
not justify this conclusion.   It is true that the dispute
between Hunter and Sogle over the right of Hunter to
appropriate any of the waters of the stream continued
until that year, and that Sogle in that year tore out a
part of the flume Hunter had constructed.   But this
was evidently an act on the part of Sogle committed in
the assertion of his claimed right to all of the waters
of the stream, and committed after Hunter had di-
verted the water.   Shortly after the commission of
the act, the dispute was settled between them, Sogle

conveying to Hunter a one-third interest in the waters of the stream. But it is clear that Hunter accepted this merely as a settlement of the dispute. He never recognized Sogle's claim to all of the waters, nor do any of the parties to the present litigation concede that he acquired any rights to the waters by reason of the conveyance.

Turning to the contention of the appellant based on its exceptions to the supervisor's report, it first argues that it has rights superior to the rights of the claimants the supervisor placed in the first class. These claimants, as we have stated, deraign their rights from the Garden and upper Sogle ditches. The argument is that Sogle was a squatter on the land, leaving the lands without acquiring title thereto, and that the rights of the subsequent taker dated from the time of his taking, which was later in time than the appropriation made by Hunter. But the evidence does not show that Sogle was a squatter in the usual sense of that term; that is to say, it does not show that he was a squatter in the sense that he settled upon the land, held it for the time being, and moved away leaving it for the next taker. At the time of his settlement, the land was not subject to entry, the government surveys not then having been extended over it. But he made valuable improvements on it, selling his rights at about the time it became subject to entry to one who did acquire title to it. We think the purchaser acquired the rights of Sogle, and that his right to the water of the stream relates back to the time of Sogle's appropriation. These claimants, since they deraign their titles from this appropriation, have the right to claim from the date of the appropriation, and are not appropriators as of the time Sogle sold his interests.

[2] A further argument is that Hunter had an interest in the Garden and Sogle ditches, and has at least

equal rights with the claimants whom the supervisor placed in his first class. But while Hunter, as we have before stated, assisted in the construction of the Garden ditch with the expectation that it would be extended onto his land, it is clear that he later abandoned any claim of right therein and began the construction of an independent ditch, through which he diverted water to his property. The appellant's rights therefore must date from Hunter's individual effort, and, as this was later in time than the Sogle appropriation, it is later in right.

[3] Passing to the claimants whose rights the trial court classed as superior to the rights of the appellant, the first to be noticed are the claimants Laugenour. These claimants derive their rights through one John Desutel. Desutel settled on land riparian to the stream in 1882, above the lands of Hunter. This settlement was continuously maintained by Desutel and his successors in interest, and in so far as the claimants have rights in virtue of their riparian ownership, their rights are superior to the rights of the apellant. The decree of the court recites, however, that Desutel diverted the waters of the stream to a beneficial use on the land in the year 1882. For this conclusion we can find no support in the record. Desutel began the construction of a house on the land in the fall of the year 1882, completing it and moving therein with his family in the early spring of the following year. When the land became open to entry, he filed a preemption claim thereon, under which he afterwards acquired title. He sold the land to one Steen in 1886, who in turn sold to one Richardson in 1891 or 1892. The claimants here in question derive their rights by mesne conveyances from Richardson. Desutel never used the waters of the stream for irrigation. It is in evidence that, at one

time early in his settlement, he undertook to turn water from the creek onto a garden by means of a furrow made with a plow, but that he miscalculated the elevations and did not succeed. During the time he occupied the land, he made no further efforts in that direction. His successor Steen possibly irrigated a garden in 1886, but the evidence of the witness through whom the fact is sought to be adduced leaves it in doubt. The better evidence is that water was first brought onto the land by Richardson after his purchase from Steen. The claimants seek to connect their rights with the efforts of Desutel, but manifestly his efforts were insufficient to create a right by appropriation. Water was not diverted by him, and he did not follow up his efforts with that diligence necessary to pass any right he acquired by his initial effort to his successor in interest.

The claimant Lucy M. McLean, whom the trial court advanced from a class inferior to the appellant to a class superior thereto, deraigned her title through one Maximillian Desutel. This Desutel settled on lands riparian to the stream in the year 1880. He acquired title through a homestead claim, and parted with his interest in the land in the year 1886. Both the supervisor and the court found that water was first diverted onto the land for irrigation purposes in the year 1886. An argument is made to show that these conclusions are in error. It was shown that Desutel raised both cereal crops and vegetable gardens on the land during the term of his occupancy, and the inference is drawn, since the land is arid, that he must have used water for the purposes of irrigation. But it was shown that both cereal crops and gardens could be grown, and were successfully grown in the valley of the stream by other settlers without irrigation. The inference,

therefore, that Desutel must have irrigated his land because he grew such crops has but little foundation. It is more probable that he followed the practice of the other settlers. At any rate, we cannot conclude that the inference overrides the positive evidence that water was first diverted for use on the land by his successor in interest. This claimant, therefore, has no right to the water superior to the right of the appellant, save such as may attach to the land in virtue of prior riparian ownership.

The claimant Axel Victor, whom the court also advanced from a class inferior to a class superior to the appellant, claims under a riparian settlement made in the year 1883, and an appropriation made in the year 1898. In so far as he has riparian rights, they are superior to the rights of the appellant, but inferior in so far as they are rested on the right by appropriation. The tract involved is the third in class ten, as reported by the supervisor, and contains two acres of land.

Of the rights of the other claimants whom the court advanced from a class inferior to the appellant to a class superior thereto, namely, Campbell, Huffaker and wards, Johnston, Lakey and Axtel, little needs be said. There is no contention that they have appropriation rights in the waters of the stream superior to the appropriation right under which the appellant claims. The court advanced them because of their riparian rights, reciting in its decree that they deraigned title from settlers who made settlement on the stream in the year 1884. Since we conclude that the appropriation under which the appellant claims dates from the year 1883, these claimants have neither appropriation nor riparian rights which antedate the rights of the appellant.

[4] The lands of the appellant, while in the valley of Hunter creek, are non-riparian to the stream when

tested by the artificial lines of the government surveys. It seems that Hunter, the appellant's predecessor in interest, settled on the stream and laid claim to lands riparian thereto. This was prior to the extension of the government surveys over the land. When the surveys were so extended, he found that the major part of his improvements were on a quarter section non-riparian to the stream. He thereupon entered the quarter section containing his improvements, and later acquired title thereto. But the fact that the lands are non-riparian in no way affects the rights he acquired by his appropriation. Water may be taken by appropriation for use on land non-riparian to the body of water from which it is taken. Nor does private ownership of land riparian to the stream prevent such an appropriation. All may be taken not attaching as a riparian right to the lands so owned. These principles have long had the approval of the courts. They were early announced by the supreme court of the United States: *Atchison v. Peterson*, 20 Wall. 507; *Forbes v. Gracey*, 94 U. S. 762; *Broder v. Water Co.*, 101 U. S. 274. They have also received the sanction of Congress. U. S. Rev. Stat. § 2339. They were the principal questions involved in the case of *Weitensteiner v. Engdahl*, 125 Wash. 106, 215 Pac. 378, from this court. In that case, it appeared that Weitensteiner, in the year 1890, entered under the homestead laws a tract of government land, near but non-riparian to a stream known as Grouse creek. In the fall of the same year, he appropriated waters from the creek for the purpose of irrigating the lands. Subsequent thereto, the predecessor of Engdahl entered as a homestead government land riparian to the creek above the point of diversion, and began using the water to irrigate his riparian land. His use of the water did not materially reduce the flow at Weitensteiner's point of diversion, and no

notice was taken of it. Thereafter Engdahl acquired the land, and, in August 1920, diverted for irrigation purposes practically all of the waters of the creek. Weitensteiner sued to enjoin the diversion, claiming a superior right to the use of the water by reason of his prior appropriation. The trial court sustained his claim, and its holding was affirmed by this court.

The same questions were presented in *Brown v. Chase,* 125 Wash. 542, 217 Pac. 23. There we also held that waters in a stream which were in excess of the amount that could be beneficially used by a riparian owner, could be taken by appropriation for use on non-riparian lands. To the same effect is *Proctor v. Sim,* 134 Wash. 606, 236 Pac. 114. See, also *In re Waters of Doan Creek,* 125 Wash. 14, 215 Pac. 343, and *In re Alpowa Creek,* 129 Wash. 9, 224 Pac. 29. Nor is the case of *Nesalhous v. Walker,* 45 Wash. 621, 88 Pac. 1032, to the contrary. In that case the court refused to apply the doctrine of appropriation because it held the doctrine inapplicable to the facts of the case, not because of a repudiation of the doctrine. The land riparian to the stream was all in private ownership at the time the attempted appropriation was made, and it was held that the riparian owners had equal rights in the stream, and this, notwithstanding the owner attempting to appropriate initiated his settlement which ripened into title prior in time to the settlements of the others. The decision recognized our previously announced rule that a reasonable use of the waters of a stream for the purposes of irrigation was a right attaching to riparian ownership, and deduced therefrom the further rule that where all of the lands riparian to a stream were in private ownership, and where a reasonable use of the water for irrigation purposes by the riparian owners exhausted the supply of water the stream afforded, there was no room for an appropriation.

As we have hereinbefore noticed, the supervisor, in making his classification, gave no heed to the riparian rights of the several claimants, justifying his action on the ground that custom in the particular district was to that effect. The trial court refused to follow the supervisor in this respect, holding that the claimants making use of the water in virtue of their riparian rights were entitled so to do. The record on this branch of the case need not be reviewed. It is sufficient to say that we do not find that the conclusion of the supervisor is justified.

It follows from our view of the record that none of the claimants, save only those which the supervisor placed in his first class, has rights in the waters of the stream by appropriation superior to the rights of the appellant. It follows, also, since we conclude that the appropriation right of the appellant dates from the year 1883, that none of the claimants has riparian rights which antedate its right, save three only, the Laugenours, Lucy M. McLean and Axel Victor. The first of the claimants mentioned were classed as prior in time to the appellant by both the supervisor and the court, and we have hereinbefore indicated our concurrence in that view. It remains then to inquire what rights the last of the claimants have in virtue of their riparian ownership. The trial court classed them as having co-equal rights, notwithstanding the initiatory settlement of the one antedated that of the other. This is in accord with our holding in *Nesalhous v. Walker, supra,* and is in accord with what we then and now conceive to be the rule of the common law.

[5] But the court further held this right to be the equivalent of an appropriation right; it held that the claimants had, by reason of their riparian ownership alone, a right to use the waters of the creek for irrigation to the extent of the needs of their lands, regardless

of the fact whether such use exhausted the waters of the stream and regardless of the rights of other riparian owners. It seems to have so held because of the appellant's intervening appropriation; that, because the appellant had, by its appropriation of the waters, cut off the rights of subsequent riparian proprietors, the prior riparian owners could in some way benefit by that act. We cannot think this accords with either reason or authority.

Land in the United States is never without ownership. The primary title is in the United States. Prior to its disposition of the land, it owns not only the land itself but all of the rights that attach to the land. Where the land borders on a stream, this ownership includes the riparian rights which attach to the land. When, therefore, it segregates a proportion of the land from the whole, and conveys the proportion to a private individual, it conveys only such proportion of its riparian right as the riparian land conveyed bears to the whole of the lands riparian to the stream. The rule of the court would mean that the first settler on the stream would acquire, in virtue of his settlement, the right to use all of the waters of the stream for irrigation purposes, if the needs of his land required it, leaving nothing for the subsequent settlers. This would not only destroy the rule of equality between riparian owners, but would make the riparian right equivalent to an appropriation right.

The authorities, as we understand them, are in accord with these principles. Perhaps, they are no more clearly stated anywhere than they are by·Mr. Gould in his work on Waters. That author, citing many English and American cases in support of his text, uses this language in the cited sections of his work:

"§ 205. Each riparian proprietor has a right to the ordinary use of the water flowing past his land, for

the purpose of supplying his natural wants, including
the use of the water for the domestic purposes of his
home or farm, such as drinking, washing, or cooking,
and for his stock. For these natural uses, by the
weight of authority, he may, if necessary, consume all
the water of the stream. This right is his only, and
is strictly confined to riparian land. He has also the
right to use it for any other purpose, as for irrigation
or manufactures; but this right to the extraordinary
use of the water is inferior to the right to its ordinary
use; and if the water of the stream is barely sufficient
to answer the natural wants of the different pro-
prietors, none of them can use the water for such ex-
traordinary purposes as irrigation or manufactures.
It was formerly held that the diversion of the water
for the purpose of irrigating the land of a riparian
proprietor is a natural want, and that an action could
not be maintained by a lower proprietor, who is thereby
injured for want of irrigation; but, according to more
recent decisions, a diversion of water for this purpose
is an extraordinary and not an ordinary use, and can
only be exercised reasonably and with a proper regard
to the right of the other proprietors to apply the water
to the same or other purposes. The term 'domestic
purposes' extends to culinary and household purposes,
to the watering of a garden, and to the cleaning and
washing, feeding and supplying the ordinary quantity
of cattle.

"§ 206. The right to such extraordinary use of
flowing water is common to all riparian proprietors.
It is not an absolute and exclusive right to all the
water flowing past their lands, but it is a right to the
flow and enjoyment of the stream, subject to a similar
right in all the proprietors, their privileges being in
all respects equal.''

And under the special sub-title "Irrigation," at
§ 217, he says:

"The right of a riparian proprietor to divert the
water of a stream for the purpose of irrigation is rec-
ognized in England, and generally in this country.
According to the later decisions in both countries this

is not a natural want, authorizing an exclusive or un-
due appropriation by one proprietor, but the use of the
stream for this purpose must be reasonable and must
not materially affect the application of the water by
other riparian proprietors.  The extent of each pro-
prietor's right to thus withdraw the water depends
upon the circumstances of the case.  The owner of a
large tract of porous land, abutting on one part of the
stream, could not lawfully irrigate such land contin-
ually by canals and drains, and so cause a serious di-
minution of the quantity of water, though there may
be no other loss to the natural stream than that arising
from the natural absorption and evaporation of the
water employed for the purpose.  If the water used
for irrigation is not abstracted on a person's own land,
but is withdrawn at a distance above it or returned at
a distance below it, this would have a material bearing
upon the question of reasonable use with respect to an
opposite or other proprietor affected by such diversion.
So, a riparian proprietor who obstructs the stream by
a dam for the purpose of overflowing and irrigating
his land, or who diverts the water for such purpose
excessively, and without returning the surplus into the
natural channel, is liable to the owner of a mill below,
the operation of which is thereby impeded, or to an-
other proprietor below, who only uses the water for ir-
rigation and is deprived of that right to an unreason-
able extent.''

So Mr. Justice Burnett in *Caviness v. La Grande
Irr. Co.,* 60 Or. 410, says:

''For domestic use, including water, not only for his
household, but also for such animals as are essential
for the proper sustenance of his family, the upper ri-
parian owner may take so much of the water of a na-
tural stream as may be necessary for that purpose, al-
though none may be left for the lower riparian owners.
So far the use is grounded on actual necessity.  But
irrigation is not so essentially a vital requirement, and
riparian use for that purpose is limited at all times by
the condition that it must be so exercised as not to
materially injure the rights of other riparian owners

in the proportional use of the water of the same stream for the irrigation of their riparian lands. On the other hand, an appropriator, subject to rights in existence at the time his appropriation is made, may take all the water he can use reasonably and without waste for a beneficial project, although it may be the lion's share and none may be left for those who come afterwards. In other words, a riparian owner, using water in that capacity, is in a sense always a tenant in common with other riparian owners on the same stream whose rights, at least for irrigation, he is bound not materially to injure by his riparian use of the water. The appropriator, however, is always a tenant in severalty owing no duty or respect to those endeavoring to use the water by title subsequent to his own.''

Our case of *Nesalhous v. Walker, supra,* is rested on these principles. As we have hereinbefore pointed out, the riparian owners in that instance acquired title to their riparian lands by settlements at different dates, yet we held that rights were equal; that the first in time had no superior rights arising from his prior settlement. In the course of the opinion, we used this language:

''In the case now under consideration, all parties concerned acquired or initiated their rights to their respective tracts before any attempt was made to acquire rights in the waters of the stream by appropriation. Therefore their rights in the stream and the waters therein flowing must be determined by the rule announced by this court in the case cited. It was there declared that the common law doctrine of riparian rights is not inconsistent with a reasonable use of the waters of the stream by riparian owners for the purposes of irrigation. Perhaps as correct and definite a statement of the common law rule governing the rights of riparian owners as can be found is the following, from the opinion of the court in *Harris v. Harrison,* 93 Cal. 676, 29 Pac. 325:

'' 'According to the common law doctrine of riparian ownership as generally declared in England and in

most of the American states, upon the facts in the case
at bar the plaintiffs would be entitled to have the
waters of Harrison Canon continue to flow, to and
upon their lands as they were naturally accustomed to
flow without any substantial deterioration in quality
or diminution in quantity. ˙ But in some of the western
and southwestern states and territories, where the year
is divided into one wet and one dry season, and irriga-
tion is necessary to successful cultivation of the soil,
the doctrine of riparian ownership has by judicial de-
cision been modified, or, rather, enlarged, so as to in-
clude the reasonable use of natural water for irrigating
the riparian land, although such use may appreciably
diminish the flow down to the lower riparian pro-
prietor. . . . Of course, there will be great dif-
ficulty in many cases to determine what is such reason-
able use; and ''what is such reasonable use is a ques-
tion of fact and depends upon the circumstances ap-
pearing in each particular case.'' . . . The larger
the number of riparian proprietors whose rights are
involved, the greater will be the difficulty of adjust-
ment. In such a case, the length of the stream, the
volume of water in it, the extent of each ownership
along the banks, the character of the soil owned by each
contestant, the area sought to be irrigated by each—
all these and many other considerations must enter
into the solution of the problem; but one principle is
surely established, namely, that no proprietor can ab-
sorb all the water of the stream so as to allow none to
flow down to his neighbor.'

''In *Smith v. Corbit,* 116 Cal. 587, 48 Pac. 725, it was
held that riparian owners are entitled to have their
natural wants supplied by using so much of the water
as is necessary for strictly domestic purposes, and to
furnish drink for man and beast, before any can be used
for purposes of irrigation; and after their natural
wants are supplied, each party is entitled to a reason-
able use of the remaining water for irrigation, and
where the interests of the parties will be conserved
thereby, the court may apportion the flow of the water
of the stream to the respective owners by periods of

time, so that each may have the full flow during the designated period. See, also, *Jones v. Conn*, 39 Ore. 30, 64 Pac. 855, 65 Pac. 1068; Pomeroy, Riparian Rights, § 134.

"While the distribution of the water of a stream among riparian owners, according to common law principles, is most difficult, where the stream is long, the riparian owners numerous, and the quantity of water limited, yet in this case each of the parties own the same quantity of land of substantially the same character, their necessities and conditions are substantially the same, and an equal distribution of the water of the creek between them will mete out substantial justice as nearly as substantial justice can be attained."

So, as we said in *Smith v. Nechanicky*, 123 Wash. 8, 211 Pac. 880:

"The common law doctrine of riparian rights is the rule established in this state. But under this doctrine the riparian owner cannot use all the water of the stream to the exclusion of other riparian owners merely from the fact of his riparian ownership. Such ownership does not give one the right to make an unreasonable use of the water, the rights of all being mutual. *Benton v. Johncox*, 17 Wash. 277, 49 Pac. 495, 61 Am. St. 912, 39 L. R. A. 107; *Nesalhous v. Walker*, 45 Wash. 621, 88 Pac. 1032."

[6] The supervisor found, and the trial court followed the finding, that the land appurtenant to the stream here in question was similar in the respect that each of the tracts required the same quantity of water per acre to irrigate it successfully. From this finding, which we approve, and from the conclusions we have above indicated, it must follow that the riparian claimants named have only the right as against the appellant's appropriation to take from the stream for irrigating purposes such proportion of the water as their riparian lands bear to the quantity of riparian lands on the stream and capable of being irrigated therefrom.

The supervisor found that there were riparian to the stream 1,040 acres of land capable of being irrigated therefrom. That of this land the Laugenours owned 133 acres; that Lucy M. McLean owned 70 acres, and that Axel Victor owned 2 acres. If these findings be correct, it would mean that the Laugenours were entitled, as superior to the appellant, to 133/1040 of the waters; that Lucy M. McLean would be entitled to 70/1040 thereof, and that Axel Victor would be entitled to 2/1040, the precise quantity to increase and diminish as the flow of the water in the stream increases or diminishes.

But another consideration prevents us from directing a decree to this effect. As we have shown, the trial court placed in one class a number of claimants as having equal rights. Our study of the records indicates that the rights of these claimants are in no sense equal. Many of them had appropriation rights antedating any claim of right of others put on an equality with them. Since they have not appealed from the decree they are bound by it. The rule, however, does not apply to those affected by the modification of the decree we are compelled to make. Since these were satisfied with the decree they had no occasion to appeal, and may as between themselves have an adjudication anew as to their priority of right.

To apportion the waters in accordance with the rules above indicated, as we noticed in the case of *Nesalhous v. Walker,* presents a problem somewhat difficult of solution. We shall not ourselves attempt it. It can better be done by the trial court, who will have not only the aid of the parties interested but the aid and advice of the many learned counsel who represent the parties.

Our order is, therefore, that the cause be remanded

to the trial court with directions to modify the decree in the following particulars:

(1.)    Place in Class 1, as having superior rights, all of the claimants whom the supervisor placed in his Class 1, allowing them the quantity of water to which he found them entitled;

(2.)    Place in Class 2, the claimants Laugenour, McLean and Victor, allowing to them the quantity of water to which they will be severally entitled as prior riparian owners under the rule of admeasurement we have above indicated;

(3.)    Place in Class 3, the appellant Hunter Land Company, allowing to it the quantity of water to which the supervisor found it entitled, subject only to the quantity awarded to the prior classes;

(4.)    Award to the claimants whose rights are affected by the modification of the decree we direct to be made, the remaining waters in the stream, measuring their rights by the rules we have hereinbefore announced.

The appellant further contends that certain of its lands capable of being irrigated from the stream reported by the supervisor were not classified by the trial court. Error in this respect, if error there was, may be corrected at the hearing which must follow.

The cause is remanded for further proceedings as above directed.

TOLMAN, C. J., MAIN, MITCHELL, MACKINTOSH, HOLCOMB, ASKREN, and BRIDGES, JJ., concur.