**UNITED STATES**

v.

**AHTANUM IRR. DIST. et al.**

**No. 312.**

United States District Court
E. D. Washington, S. D.

March 7, 1953. Amended Jan. 18, 1954.
Supplemental Opinion Jan. 18, 1954.

Harvey Erickson, U. S. Atty., Spokane, Wash., William H. Veeder, Sp. Asst. to Atty. Gen., Geraint Humphrey, Chief, Irrigation Counsel, U. S. Indian Service, Los Angeles, Cal., Edward G. Swindell, Jr., Regional Counsel, Bureau of Indian Affairs, Portland, Ore., for plaintiff.

Henry R. Newton, Spokane, Wash., Brown, Hawkins & Olson, Olson & Palmer, V. O. Nichoson, Douglas A. Wilson, L. B. Vincent, Lee C. Delle, John H. Lynch, George E. Clark, Yakima, Wash., Helsell, Paul, Fetterman, Todd & Hokanson, Seattle, Wash., Kenneth R. L. Simmons, Billings, Mont., Emory, Howe, Davis & Riese, Seattle, Wash., Morthland & Morthland, Velikanje & Velikanje, M. C. Delle, Ronald R. Hull, Yakima, Wash., Little, Leader, LeSourd & Palmer, Graves, Kizer & Graves, Seattle, Wash., Chalmer G. Walter, Yakima, Wash., Cannon, McKevitt & Fraser, Spokane, Wash., Wm. J. O'Hear, New York City, for defendants.

JAMES ALGER FEE, District Judge.

By the Treaty of 1855, the Yakima Indians ceded to the United States all their rights in a larger expanse now included in the State of Washington and reserved a smaller area for their own use. For them the United States became trustee of this land. The north boundary of the reservation ran along Ahtanum Creek, but did not include the stream.[1] The bulk of the water there comes from a branch which has its source upon what were then by that cession public lands of the United States. During the ninety-seven years since the treaty, numerous persons, defendants here, have acquired lands north of the reservation by patent from the United States. Both before and after the issuance of patents, these owners and their predecessors made beneficial use of the waters of the Ahtanum upon various of these parcels of land and now possess water rights appurtenant thereto. After 1873, there was considerable water appropriated therefrom by the whites, and some was appropriated for Indian lands. Some few years later, Washington was admitted as a state, 25 Stat. 676, 26 Stat. 1552. After the admission, appropriations continued both north and south of the Ahtanum until more was claimed than flowed therein at low water stage. When governmental agencies finally became impressed with the opportunity of reclamation of western lands, under federal control, this feature led to conflict.

However, in 1908, an agreement was made by government agents and representatives of white owners dividing the water between the reservation and the lands beyond.[2] Still later, at the suggestion of the government, the rights of the users upon lands off the reservation were fully adjudicated by the state courts. The Indian lands involved had been allotted in severalty and were held individually by trust patent, and the Indian nation, as such, ceased to have rights therein. A great number of these

---

1. 12 Stat. 951. It is obvious, notwithstanding doctrines of international law relating to treaties of civilized nations and notwithstanding the domestic common law of the states or of England relating to the thread of the stream, which the Indians certainly did not understand, that neither the Indians nor the white negotiators considered the water of any value except for fishing and for the limited domestic and stock uses of that date. The stream was not considered an important asset to the reservation as a whole or to any particular parcel of land at the time. The attempt to read current demand for water into the language of this treaty is to forget the events of a hundred years of history.

2. This agreement, dated May 9, 1908, and signed by W. H. Code, Chief Engineer of Irrigation, Indian Bureau, approved June 30, 1908, by Frank Pierce, First Assistant Secretary of the Interior, and by representatives of the users of water situated north of the boundary, was recorded in the office of the Auditor of Yakima County, Washington, in Vol. 72 of Deeds on page 35.

allotments have been patented in fee and are now owned by whites. Water is furnished to such lands by a ditch originally constructed to carry the share of the waters of the Ahtanum set aside for the Indians by the agreement above referred to. In 1947, the government brought this proceeding to obtain the entire flow of the Ahtanum for the Indians. The whites who claim waters north of the boundary are made defendants, as well as the successors of the Indian allottees on the reservation. The claim of the government set up by the complaint is that by the treaty there was reserved for the Yakima Indian nation the right to all the water of the stream for use upon lands included in the reservation.

When the United States, by the Act of July 26, 1866, 14 Stat. 251, and subsequent legislation, freed the waters flowing unappropriated over public lands in order to allow ownership to be acquired therein by beneficial use, the Territorial Legislature, differentiating the conditions prevailing then in Yakima County, proclaimed that the custom of appropriation would be the source of the title to water rights in the area thereafter.[3] By executive and congressional action, based upon the consent of the people in the area, the State of Washington was thereafter admitted to the Union. Following the precedent set by the territorial lawmakers, the State has adopted, by legislation of its people, by acts of its legislature and by decisions of its courts, and has promulgated the law within its boundaries. In judicial proceedings brought regularly in its courts, the State has continuously exercised jurisdiction over waters so appropriated in Yakima County, where the reservation and the other lands lie,[4] with the exception of the water allocated to the Indians by the agreement of 1908.

The State, with the consent of all concerned, has appeared as intervenor in this proceeding to protect its rights and prerogatives as the local sovereign and as parens patriae in behalf of the individual patentees north of the boundary, who are its citizens and who claim property rights under its laws and under the decrees of its courts.

This case then, at the outset, presents a highly important problem as to the authority of the federal government over property rights granted by it to individuals within the confines of a state admitted upon equal footing with the thirteen original states. As a preliminary to a determination of these questions, it must be discovered how far the claims of the United States impinge upon the sovereignty of the State of Washington, to which was reserved "the powers not delegated to the United States by the Constitution, nor prohibited" by the fundamental law "to the States respectively".[5]

The division of powers between the central government and the states is fundamental and is firmly established by the Constitution. The authority of the federal government is limited by the words of that document and is by definition either express or implied by necessity from the fundamental text. But in time of war, in the interest of self-preservation, these guaranties may necessarily be eroded in the rush of events. Nevertheless, it is essential to preserve the balance of local and central governments thus established. It is as much the duty of this Court to preserve states' rights as to confirm in the federal government the necessary authority in an existing emergency.

In the expanse of water law, the rights of each state to control its domestic economy have been expressly recognized. The property interests of individuals established under the theory of water rights current by the interpretation of the particular state have been

---

3. Session Laws 1873, p. 520.

4. C. Horowitz, Riparian and appropriation rights to the use of water in Washington, 7 Wash.L.Rev. 197.

5. Amendment X, Constitution of the United States.

treated as vested rights. At the culmination of a series of cases which pointed the way, the Supreme Court of the United States, in California-Oregon Power Co. v. Beaver-Portland Cement Company, 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356, affirmed a decision made by the writer of this opinion in the federal District Court for Oregon, 9 Cir., 73 F.2d 555, and gave final confirmation of the doctrine that the individual state, by legislation and decision, has absolute power to lay down its own peculiar rule of property rights in waters within its boundaries. These rights of the state, the United States recognized when the State of Washington was admitted, and no reservation was made of the rights to water or control thereof, notwithstanding thirty years had then passed since the proclamation of the treaty. There is then no residual power of the federal government to reclaim or recapture water rights which it has granted to individuals and which the State has recognized since its admission to the Union. It is conceded in this case that there are no paramount rights of the government in the sense that exercise of uncontrolled sovereign power is involved.

But, more important still, the act of admission was a grant of jurisdiction. The gift of the power to hear and decide, bestowed by the sovereign people of this country through their representatives in Congress and the executive department, must be weighed in the light of precedents set up in the dusk of Anglo-Saxon law. But we need not evoke dim memories of grants of jurisdiction such as soc and sac, infangthief and utfangthief, in order to decide this problem. Questions of jurisdiction mark the boundaries of power between sovereignties. If the courts fail to uphold the reservation of power by the Tenth Amendment—the rights of the states against federal administrative aggression—the essential structure of our balanced authorities will be destroyed.

With the act of admission, there was ceded to the State of Washington jurisdiction to adjudicate the rights of persons as to property within its boundaries.[6] The federal courts for this purpose are courts of the state in which they sit. Once a property right in a res has been adjudicated under this grant of jurisdiction, the decree is binding upon all the world, including the government.[7]

On this primary branch of the controversy, therefore, the Court holds that the State of Washington has had, since its admission, sovereign power to promulgate by legislation and decisions of its courts a rule of waters for property within its boundaries. The United States had no sovereign powers to change or amend such a law of waters. While the United States had power upon its own lands or lands held in trust to make rules which were different from those which had force in the rest of the state, the government had no power to impose such rules upon property outside the reservation. The municipal law of the state was binding not only upon all the other lands and waters of the area outside the reservation, but specifically upon all patented lands and owners thereof within its limits.[8]

But, if we lay aside these pretensions of continuing sovereignty upon the part of the federal government, there still remain serious questions of the property rights in realty or in water now used outside the limits of the reservation. It should then be considered whether the government, upon its own behalf, has pleaded rights to real property or rights in water and has proven these in strict accordance with the substantive law as

6. Pollard v. Hagan, 3 How. 212, 44 U.S. 212, 11 L.Ed. 565.

7. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

8. The local law will govern the interpretation of patents. Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428; Whitaker v. McBride, 197 U.S. 510, 25 S.Ct. 530, 49 L.Ed. 857. Compare Sturr v. Beck, 133 U.S. 541, 10 S.Ct. 350, 33 L.Ed. 761.

promulgated by the state by the evidence adduced at trial.

Even in the field of property rights, the feeling of the paramount sovereignty of the central power makes itself prominent.[9] During the last few years, as a result of the drive to acquire paramount rights, there has been apparent the theory of the policy-making agents that the government has the power to re-examine all grants, no matter how ancient or how well recognized by contemporary legislation and construction of nearly a century, as if the central government were still, as it once was, landowner and sovereign of all the rights in the area covered by the western states.

The situation has two cardinal points: first, the adjective or procedural; second, the substantive law. On the procedural side then, it has become the fashion for the policy-making lawyers of the government to direct the filing of complaints against individuals, which do not permit the examination of the rights of the government, but which burden the private defendant with the necessity of disproving every possible aspect of any putative claim that ingenuity may subsequently suggest. It was nothing new in this case, therefore, that a complaint was filed which stated no cause of action and apparently suggested some right over and above the rights which ordinary landowners for whom the government is trustee would have. It is characteristic of the attempt to retake for the benefit of the central power rights which long ago passed into private ownership.

Since the complaint did not define the rights of the individual wards of which the government was acting as trustee, the motion to dismiss might well have been sustained.[10] The loose rules of pleading, however, give full scope for anyone attempting to prevail by use of the paramount position of the sovereign.[11] Therefore, the questions of law were reserved for trial and pre-trial conferences were held. These devices, which are so eminently successful with private litigants, failed completely to obtain definition of the government position from these attorneys, acting on direction from the national capitol. The result is that the fundamental theory of the government lawyers has never been outlined in the pre-trial order or elsewhere. Instead, it was argued with tremendous insistence that each individual landowner must affirmatively allege

9. An attempt to take back vested interests in lands already patented by the United States without adjudication was prevented by the United States Supreme Court in United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267, in the first instance. In subsequent proceedings, the persistent effort to expropriate such interests in realty by executive order was finally defeated by the decisions in United States v. Otley, D.C., 34 F.Supp. 182, affirmed United States v. Otley, 9 Cir., 127 F.2d 988.

The attempt to write a new type of land title by condemnation proceedings was frustrated in United States v. Bauman, D.C., 56 F.Supp. 109; United States v. 9.94 Acres of Land, D.C., 51 F.Supp. 478. See United States v. 16.747 Acres of Land, D.C., 50 F.Supp. 389.

Further, the attempt to escape payment for actual property interests taken was prevented in United States v. Aho, D.C., 68 F.Supp. 358, and United States v. Florea, D.C., 68 F.Supp. 367.

10. Under the state court rules, a complaint in an action to quiet title to a water right or to enjoin a violation thereof should distinctly allege (1) ownership and possession of the right by plaintiff, (2) invasion of and injury to the right by defendant, and (3) call upon defendant to set up any adverse interest defendant may have. Spring Hill Irrigation Co. v. Lake Irrigation Co., 42 Wash. 379, 85 P. 6; Miller v. Lake Irrigation Co., 27 Wash. 447, 67 P. 996; Simpson v. Harrah, 54 Or. 448, 103 P. 58, 1007; Kinney on Irrigation and Water Rights (1912), § 1547.

In an action to quiet title to a water right, the complaint should show that the plaintiff owns or possesses any subsisting interest in, or right to, the exact quantity of water or the use thereof. See Inyo Consolidated Water Co. v. Jess, 161 Cal. 516, 119 P. 934, 935.

11. See Wiel, Water Rights in the Western States (1911), § 636.

and prove by a preponderance of the evidence his title to the water right of which he is in possession by long user and also the beneficial use to which he is now placing the water and, more especially, the absence of waste.

Before any discussion of the proof, reference must be made to the pre-trial order drawn by the lawyers but signed by the judge. There were no issues of fact or law to particularize the claims of the government. An attempt to try issues which have not been outlined by either pleadings or pre-trial order is not only futile, but it is unjust. Any issue not so formulated cannot be tried because the parties do not know against what to defend. It is not in the case. The provision of the Civil Rules [12] that any issue upon which evidence has been introduced without objection may be decided in the trial court or on appeal is invalid if it include such an issue. Unless the cause of action and defense be somewhere delineated before judgment, to the knowledge of the parties, due process of law has not been accorded and the trial is patently unfair.

This Court refuses to try any such issue.

The Court therefore tries the one issue of whether the government has proven that it is trustee for the Yakima Indian nation of the entire flow of the Ahtanum reserved by the Treaty of 1855 and therefore has the right to an injunction against anyone using any of the flow.[13]

The government had the burden of establishing either that the Indian wards had had possession of the water right and had been ousted recently by the defendants or that these wards had title thereto and, as a result, the right to immediate possession.[14] This principle is firmly settled in land litigation whether at law or in equity.[15] The possession of the flow or usufruct is proven by actual application of a specified quantity of water to a beneficial purpose on a particular piece of land.[16] Water rights, whether riparian or appropriative, constitute real property and are appurtenant to particular pieces of land.[17] The proof must have shown, in

12. Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

13. The party alleging the existence of a water right has the burden of proof and must prove it unequivocally. Wiel, Water Rights in the Western States (1911), § 636; United States v. Humboldt Lovelock Irrigation Light & Power Co., 9 Cir., 97 F.2d 38, 42.

14. All the authorities are in accord that, in an action for an injunction against interference with, or to quiet title to, water rights, the burden is on the plaintiff to establish his ownership of the right in question. · Miller v. Lake Irrigation Co., 27 Wash. 447, 67 P. 996.

 In Spring Hill Irrigation Co. v. Lake Irrigation Co., 42 Wash. 379, 85 P. 6, a complaint alleged ownership in fee simple and possession of the first right to divert water. The Court held, 85 P. at page 7: " * * * it alleged a good title to water rights, and it challenged the defendants to set up any claims they had against such rights."

 " * * * where it appears or was admitted that the plaintiff was the holder of the record legal title and entitled to the

possession, it then devolved upon the defendants to avoid that title * * *." White v. McSorley, 47 Wash. 18, 91 P. 243, 244.

 "If the plaintiff claims a superior right by appropriation, the complaint must set forth, with sufficient clearness and fullness, the fact of appropriation, the purpose for which the appropriation was made, and the amount of water necessary to effect such purpose." Black's Pomeroy on Water Rights (1893), § 73, p. 130.

 An allegation that plaintiff had a right to all the water in the creek during the dry season has been held too indefinite for specific relief. Porter v. Pettengill, 57 Or. 247, 110 P. 393. See also Long on Irrigation, 2d Ed., § 269, p. 463.

15. Kinney on Irrigation and Water Rights (1912), §§ 1554, 1640; Miller v. Lake Irrigation Co., 27 Wash. 447, 67 P. 996.

16. "His right as an appropriator depended upon continued use, and, upon abandonment of the use of any part of the water, that part was subject to new appropriation." Smith v. Green, 109 Cal. 228, 41 P. 1022, 1024.

17. "That water rights for use upon the lands are considered appurtenant to the

order to prevail or even require answer other than a general denial, that the United States appeared as trustee of the naked legal title for certain Indian wards, naming them, who owned, respectively, the equitable title to a piece of land, describing it, which land was entitled to a definite quantity of water, in cubic inches under a certain pressure, and such flow had been beneficially used thereon until deprived thereof by act of defendants.[18]

Since this was not a quo warranto proceeding, such as the Crown was wont to bring in England to question franchises and jurisdictional and property rights to the harassment of its subjects, the Court refused to require the defendants affirmatively to assume this burden. Again, in the face of the persistent refusal of the government to define claims against defendants, the Court refused to require these individuals to state an affirmative defense. This procedural claim of the government lawyers was encysted in the pre-trial order. Therefore, the exact claim of neither side is developed.

Although the pre-trial order was thus unsatisfactory, the Court signed and entered it and put the case on trial.

 The government did not prove possession of the flow as appurtenant to any piece of real property of a single drop of the water of which it claims the Indian nation is deprived by the patentees of the United States north of the boundary. In fact, there was no proof that the Yakima Indian nation had any rights in this water or interests therein. No communal lands of the Yakima nation are shown to be susceptible to irrigation by any waters of the Ahtanum or to have ever been irrigated thereby.[19] The proof does show that there are various parcels of land, held at some time by allottees, within the confines of the Yakima Indian reservation upon which approximately one-fourth of the flow of the Ahtanum has been beneficially applied since about the year 1900. But there is no complaint as to any interference by anyone with the beneficial enjoyment of this portion of the flow allocated by the agreement above mentioned which has actually been used south of the Ahtanum.

The proof does not show that most of the parcels now in trust for individual Indians are riparian to the stream. On the other hand, most of them are shown not to have any connection with any appropriation or use of water which was made before the state came into the Union. Likewise, the government did not prove that a single cubic foot of water

land, and therefore realty, is declared by our statutes and prior decisions of this court." Madison v. McNeal, 171 Wash. 669, 19 P.2d 97, 99.

"Water is sometimes held to be real estate, and to pass by grant as the right of a riparian owner to the natural flow of a stream across his lands, a right so inseparably annexed to the soil as to pass with it, not as an easement or appurtenance, but as part and parcel of the land itself." Methow Cattle Co. v. Williams, 64 Wash. 457, 117 P. 239, 241.

18. Plaintiff's right should be stated in inches or gallons. Lakeside Ditch Co. v. Crane, 80 Cal. 181, 22 P. 76.

In Simpson v. Harrah, 54 Or. 448, 103 P. 58, at page 59, a suit to enjoin defendant from interfering with the flow of water into plaintiff's irrigation ditch, where plaintiff has claimed no definite quantity of water and the evidence does not disclose the amount to which plaintiff is entitled, the Court held: "Neither the pleadings nor the proof are sufficient to enable us to determine the water rights between plaintiffs and defendant as to the quantity of water either one needs or is entitled to, or as to their relative proportions of the water in the ditch."

In Longmire v. Smith, 26 Wash. 439, 67 P. 246, 58 L.R.A. 308, a suit to enjoin subsequent appropriators from interfering with waters appropriated from him, a plaintiff will not be deprived of his remedy because in the trial court he did not describe a definite measurement of what water he used, and because there was satisfactory proof of the amount required by his lands; but the case will be remanded to the trial court to ascertain the amount of water necessary for plaintiff's lands.

19. One of the maps indicates a minor parcel of tribal land may be susceptible of irrigation, but this is immaterial since it is not shown that water was used thereon before the agreement for division.

now being used on the north side of the Ahtanum was ever used upon the reservation from 1855 to the present time. This is conclusive that there is no right to have defendants set up specifications of their rights. The lands on the reservation are now receiving exactly the water which they have received and used since 1908.

There is no proof then of actual possession of this water by anyone south of the stream. If title were established by proof, then the right of possession would follow. The proof of title or the better right to the ownership was attempted to be adduced by the government. But here again, the indistinct allegations of the pleading distort the claims and make these unintelligible.

██ Only two-thirds of the lands susceptible of irrigation on the reservation are owned by Indian allottees, which the United States is empowered to represent as trustee. The balance have been patented in fee and, as to all property rights both of water and of land, have passed into the jurisdiction of the State of Washington. Usually these parcels were purchased from the original Indian allottee by a white man.

The government joined these owners of former reservation lands as nominal defendants, although they use water allocated to the Indians by the agreement of 1908. But its attorneys have never defined what relief they claimed against these parties. The reason for this is that such a claim is impossible of definition. The United States patented each of these parcels to an Indian in fee, and this title carried with it as an appurtenance the usufruct of that amount of water which was at that time beneficially used upon that particular piece of real property or the amount to which the land had title by reservation or riparian location and no more. The land and the water right so limited are held by the present owners under the municipal law of the State of Washington. There is no

process whereby the United States can take such water from the present owners except upon payment of just compensation. The government cannot impeach its own conveyance.

These present owners of land and water rights so patented to Indians and released from government ownership were only joined as defendants so that they could make common cause with the government against use of water on non-reservation lands. This they did by what amounts to intervention. The government in the ultimate is placed in the anomalous position of attempting to establish the title to the water for its present owners against other of its citizens who patented lands and used water thereon more than fifty years prior to the conveyance of these reservation lands.

The question of whether the government has proved title to the entire flow of the Ahtanum will now be considered. At the time of the ratification of the treaty, the United States owned all the land and the water and had complete sovereignty over the area when the Indian rights were extinguished. It was not necessary for it to make any appropriation of water for itself or the Indians. All it had to do was to take the water and use it. All authorities agree upon these propositions. However, when other rights in the area were created in private individuals and in the state by the United States and were guaranteed by it, other problems arose.

"The power of the Government to reserve the waters * * * is not denied, and could not be"[20] when it owned both land and water and was sovereign in the area. Such a reservation would be a part of the title to each piece of land and would bind all successors to any lands on the watershed. But whether there was a reservation is not a question of law but of fact.[21]

If the need were not obvious and in accordance with dictates of necessity, no reservation would be implied. The limit

20. Winters v. United States, 207 U.S. 564, 577, 28 S.Ct. 207, 212, 52 L.Ed. 340.

21. United States v. Walker River Irrigation District, 9 Cir., 104 F.2d 334.

of the implied reservation would generally be the amount of water actually appropriated within a reasonable time. In many cases, the necessary amount has been found exceedingly small. In a leading case,[22] the water of Milk River, with all its tributaries, had flowed through a larger reservation created by an early treaty. In 1888, 25 Stat. 113, by a new treaty, the reservation was diminished and one boundary placed in the center of Milk River for the purpose of allotment in severalty with the avowed intent to train these Indians to agricultural pursuits. The reservation lands were completely arid. By that time, the absolute necessity of using all available water for the reclamation of desert lands was clearly recognized by everyone. It was held that there was a reservation of waters for use on these lands and that these property rights were not destroyed by the admission of Montana to the Union less than a year later. The government, however, moved slowly, but in 1898 was constructing a canal to carry out an appropriation of five thousand cubic feet. An injunction suit was brought by it to restrain persons who were interfering with the flow of this amount of water because they had anticipated the government by making appropriations above the reservation about a year before the canal was commenced. Since the government's application of water to a beneficial purpose was within a reasonable time, it was correctly held that the reservation created a property right superior to those who attempted to claim the water by acts.

In the Walker case,[23] the government sued to prevent interference with the flow of one hundred fifty cubic feet, which was a substantial portion of the flow of a river. It appeared that the reservation had been created by executive order in 1859. Since the country was completely arid, there was immediate use of water to considerable extent by the Indians. In 1887 they were using approximately the same quantity of water as at the time the lawsuit was commenced. Upon this basis, the Court awarded them 26.25 cubic feet of water. None of these cases indicates that a reservation of an entire stream could be made for the Indians and then the lost rights recaptured from the whites, who had meantime built an empire by the use of this water upon lands patented to them by the United States for that purpose.

In a most persuasive case, Byers v. Wa-Wa-Ne,[24] the Supreme Court of Oregon construed the Treaty of 1855 with the Umatilla, Cayuses and Walla Walla, which is in almost identical terms with the one with the Yakimas. There the Umatilla River ran through the reservation, which also consisted of semi-arid lands. The trial court held, following the Winters case, that there was a water right reserved to each allotment of the reservation, and the Indian passed this to his white successors in a modified form. The Supreme Court reversed. It was held that the treaty had not reserved any rights expressly or by implication, but that by the situation, the parcels abutting on the stream had a right to water for stock, domestic purposes and the irrigation of gardens.[25] The Court upheld an administrative grant of water rights to outside persons,

22. Winters v. United States, supra.

23. United States v. Walker River Irrigation District, 9 Cir., 104 F.2d 334.

24. 86 Or. 617, 169 P. 121.

25. In a recent case, Seufert Bros. Co. v. Hoptowit, 193 Or. 317, 237 P.2d 949, at page 953, the Supreme Court of the State of Oregon reaffirmed this view and held: "The implied rights are based directly upon and grow out of the express right reserved. No right may be implied that

does not have as its basis some express provision in the treaty itself. The rule is well stated in Byers v. We-Wa-Ne, 86 Or. 617, 634, 169 P. 121, 126, as follows: 'Under any rule of construction, if it is proposed to base on the treaty such a right as that contended for by the government, there must be found in the treaty something from which the right can be implied. The treaty may be read in the light of the circumstances under which it was negotiated and ratified. Considera-

which was later confirmed by legislation. This opinion is binding upon the government because the United States Attorney represented the Indian wards, and, although the treaty was construed, there was no request for certiorari.[26]

 Here, in accordance with previous decisions, we decide that there was a reservation of the use of some waters of the Ahtanum. · But the reservation was extremely tenuous and narrow. The Court determines from the facts in evidence that there was reserved for such parcels as bordered on the stream the right to have sufficient water flow as would suffice for watering of livestock, domestic uses and the irrigation of gardens, where this was necessary on these bordering lands. A similar right was intended for the lands on the north bank riparian to the stream as well as those which comprised both banks of the main or north branch of the Ahtanum, through which flows the major portion of the water eventually found in Ahtanum Creek. The circumstances surrounding the signing of the treaty compel this construction.

The text of the treaty itself had no indication of the reservation of the waters or rights to use water. There is no word or expression therein from which any such intention can be deduced. Other rights, such as the right of fishing, which was deemed important are expressly reserved in relation to streams. The body of the Ahtanum does not run through the area carved out by the treaty. In fact,. the principal water bearing branch arises and flows for a long distance through property deliberately excluded by the treaty makers and which is at present in white ownership. The boundary of the reservation established by the treaty runs to the south bank of Ahtanum Creek and does not even include the stream.[27] If it had been conceived that water in the amounts claimed today would be needed, it would have been a matter of one stroke of the pen to include the Ahtanum. There was plenty of water upon the Yakima reservation for the needs of the Indians at that date.[28] Owing to subirrigation, which generally sufficed for the simple needs of the time, it was long before the desirability of the use of copious irrigation was realized.

The doctrine of beneficial use of water developed in the mining districts of California but a few years before even against the landowner, which was usually the federal government. The irrigation

---

tion may be given to the purposes in view and to the situation of the parties, but unless the implication of these water rights is found in the treaty when read in the light of these purposes and circumstances, the rights contended for must be held to be nonexistent.' "

26. In quite a similar situation, the Supreme Court, speaking through Mr. Justice Van Devanter, has said: " * * * as it appears that for many years the United States has employed and paid a special attorney to represent the Pueblo Indians and look after their interests, our answer is made with the qualification that, if the decree was rendered in a suit begun and prosecuted by the special attorney so employed and paid, we think the United States is as effectually concluded as if it were a party to the suit." United States v. Candelaria, 271 U.S. 432, 444, 46 S.Ct. 561, 564, 70 L.Ed. 1023. Though in a dictum this view has been reiterated recently. "If the United States in fact employs counsel to represent its interest in a litigation or otherwise actively aids in its conduct, it is properly enough deemed to be a party and not a stranger to the litigation and bound by its results." Drummond v. United States, 324 U.S. 316, 318, 65 S.Ct. 659, 660, 89 L.Ed. 969.

27. The Supreme Court in the Winters case, supra, recites the inclusion of part of the stream as a fact cardinal to the decision.

28. In fact, there is plenty of water now for the vastly expanded needs of the area. But to get this water into the Ahtanum area requires the expenditure of so much money that Congress has so far refused to make the appropriation. But, even if the legislative body is not inclined to make such an appropriation in justice to the Yakima Indians, it is no ground for robbing the white pioneers by rationalization from modern conditions to read property reservations into a Treaty of 1855.

of arid lands had not been tried. It was not until 1855 that the doctrine was given an agricultural application even in California. It was not until after 1900 that great pressure developed in regard to the use of water in this area of eastern Washington.

In 1855, the Indians were thought of as a nomadic people, who lived by hunting and fishing and whose chief property consisted in their herds of horses. The whites believed the Indians would be able to support themselves and their animals by the bounteous natural pasture on this soil with its mountains and uplands. While it was the policy of the government to confine them to one area so that they would not bother the whites, there was no policy of allotment, and only the chiefs had individual grounds given them. There was no suspicion as to how water would be used in the vast agricultural development of arid lands as modernly practiced. The government negotiators were conditioned by the idea of riparian rights and had no concept of the use of water on elevated hill slopes miles away or even watersheds away from the banks through which it naturally flowed.[29] As above noted, except in the California mining camps for about six years previously, no one had conceived of transporting water for long distances and using it upon other lands not riparian to the stream.

■■■■ The contemporaneous and practical construction carries out the idea that neither the white treaty makers nor the Indians intended any further reservations than those enumerated above. But, if it be conceived that there was a reservation of the entire flow, the United States subsequently granted these water rights to those who took by appropriation. The government had plenary power, notwithstanding a grant to the Indians under treaty or a reservation, to convey any property so granted or reserved to others. Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299. The history of the subsequent legislation, administrative acts and judicial construction can be reconciled with no other theories except these two: either there was no broad original reservation or the government granted water rights to all appropriators without regard to the reservation.

By a series of enactments, the United States permitted persons to acquire property in water as against the United States in accordance with local customs and decisions. Early among these statutes was the Act of July 26, 1866.[30]

■■■■ Theories as to riparian rights were extremely tenacious in the area which became the State of Washington. A long series of decisions of the territorial and state courts make this abundantly clear.[31] It was only after the cruelest necessity forced the change by legislation that the courts began an attenuation of the absolute rights of a riparian owner [32] for the benefit of all

29. It was subsequently said by the Joint Congressional Commission of 1913: "At the time of this treaty, irrigation was little known, and it does not appear that the subject of water rights bore any important relation to the treaty. It is certain that the value of water rights was not foreseen either by the Indians or the government." 63rd Congress, 2d Session, Senate Document No. 337, p. 23.

30. The Act of July 26, 1866, did not create the right to use by prior appropriation of the streams on public land for mining and irrigating purposes, but simply recognized such right which had grown up through the acquiescence of the government and the universal custom of the locality.

Where the government allowed the streams on public lands to be diverted for mining and irrigating, and conveyed the land while the streams were so used, the grantee took subject to the changed condition and the rights growing therefrom. Isaacs v. Barber, 10 Wash. 124, 38 P. 871, 30 L.R.A. 665; Geddis v. Parrish, 1 Wash. 587, 21 P. 314; Ellis v. Pomeroy Improvement Co., 1 Wash. 572, 21 P. 27; Tenem Ditch Co. v. Thorpe, 1 Wash. 566, 20 P. 588.

31. See Benton v. Johncox, 17 Wash. 277, 49 P. 495, 39 L.R.A. 107; Brown v. Chase, 125 Wash. 542, 217 P. 23.

32. In Washington, it is held that judicial notice will be taken of the fact that at

the people by attaching an obligation of beneficial use before a property right in water could be claimed.[33] This preconceived notion as to water held back the development of the country for many years. However, it is a startling fact that the Legislature of Washington Territory, in 1873, made a special exception of Yakima County, and, following the policy of the Congressional Act of 1866, declared the water of that area open to appropriation.[34] This was the natural result of the passage of the Act in 1866 and the application of the same to local conditions in Yakima County. More astounding still is the fact that, immediately upon the passage of this Act, there were appropriations of the waters of the Ahtanum by the whites on the north side and by the Indians on the south. We need not debate as to whether the title of this water was obtained by reservation in the Treaty of 1855, since these were made within a reasonable time thereafter, or were valid by the force of the territorial statute. No one questions the right to use this water so appropriated, even today, if beneficial use is made on the parcel to which the flow became appurtenant.[35]

Although most of the running water of Yakima County touched somewhere on the reservation, the federal government, which had still plenary power, did not repudiate the Act of the territorial legislature. No executive or administrative action was taken to prevent the appropriation of waters either by whites or Indians on or off the reserved lands. In 1877, the Congress passed the Desert Land Act, 43 U.S.C.A. § 321 et seq., which approved all appropriations made in the past and gave specific permission for appropriation of waters on such lands in the future. This enactment, passed only four years later, confirmed the statute of the territorial legislature as to Yakima County and the waters therein.

The later legislative and executive action either adds weight to the finding that in fact there was no further reservation or is proof that the water rights were conveyed away by the government or were abandoned. Let consideration of abandonment take first place. It is an inherent and essential part of the local rule of water rights that the property right fully established will be lost if there be no beneficial use of the water itself within a reasonable time thereafter. Ninety-seven years is not a reasonable time. The thirty years between the treaty and the admission of the state was not a reasonable time to

least that portion of the state east of the Cascade Mountains was included in the territory where the customary law of miners was in force and the right of appropriating water for agricultural and manufacturing purposes existed although the common law rule of riparian ownership was a part of the law of the state. Isaacs v. Barber, 10 Wash. 124, 38 P. 871, 30 L.R.A. 665; Wiel, Water Rights in the Western States (1911) § 635. See Misc. Publication 418, U. S. Department of Agriculture, 1942, pp. 62–64, 106–107.

33. The modern tendency is to limit the riparians to actual use. Kinney on Irrigation and Water Rights (1912) § 1975.

In Nesalhous v. Walker, 45 Wash. 621, 88 P. 1032, at page 1033, the Court said: " * * * riparian owners are entitled to have their natural wants supplied by using so much of the water as is necessary for strictly domestic purposes, and to furnish drink for man and beast, before any can be used for purposes of irrigation; and after their natural wants are supplied, each party is entitled to a reasonable use of the remaining water for irrigation * * *."

See also Brown v. Chase, 125 Wash. 542, 217 P. 23; Proctor v. Sim, 134 Wash. 606, 236 P. 114; State v. American Fruit Growers, Inc., 135 Wash. 156, 237 P. 498; Hunter Land Co. v. Laugenour, 140 Wash. 558, 250 P. 41.

34. Session Laws of 1873, p. 520. See Dickey v. Maddux, 48 Wash. 411, 93 P. 1090.

35. To settle once for all that use is the nub and not compliance with mere formality, the Court, in Kendall v. Joyce, 48 Wash. 489, 93 P. 1091, at page 1092, held: " * * * a valid appropriation may be made by an actual diversion and use of the water without posting any notice. The one who fails to comply with the statute requiring notice, but actually diverts and uses the water, acquires a good title * * *."

make beneficial application.[36] Even if the water has once been beneficially applied, the water right is lost if there is not continuous beneficial use through the years.[37] This is not theory, but one of the hard necessities of the country. Neither the Indian nor the government negotiators then could have intended to make such wholesale use of the water as is now claimed almost a century later.

▮ The Acts of 1866, 1870 and 1877, which were all later than the treaty, evinced an intention to convey to those settlers on the public domain the right to appropriate waters of the Ahtanum which flowed through public lands and the south bank of which alone was on the reservation.[38] These acts were so construed, and the white settlers made appropriations which became appurtenant to their lands. Acting upon the same construction, many Indians, the record shows, likewise made appropriations. The United States patented the lands to the settlers, and likewise by these acts granted the waters. The administrative construction, based upon the failure to object, shows that no one

believed the treaty could be so construed, but that the rights to the water must be obtained under the terms of the acts.

These titles were confirmed by the act of admission of the state thirty years after the treaty without express reservation of these water rights and without limitation of the jurisdiction given to the state tribunals.[39] If the United States owned land comprising a complete watershed, it could thereafter still use the water upon any of its lands. But, if there were patentees beneficially using water from the stream, the government was bound in good faith to recognize its own grants both of land and water.

Soon after admission, the State of Washington, by statute, granted to the United States the right to appropriate water for the use of any lands to which the federal government held title.[40] If the latter or its agents had conceived possible the vast development which has followed in the wake of the application, the whole stream of the Ahtanum could have then been taken. In accordance with this same theory, Congress, in

---

36. Where a stream divided into three branches, plaintiffs owned land on the two eastern channels and defendants on the western and in 1865 a dam was built diverting all the water into the two eastern channels and in 1895 plaintiffs attempted to change the flow of the water, the Court held: " * * * the acquiescence by plaintiffs and their grantors and all riparian owners below the point of divergence for a period of 30 years has now lost them the right to change the flow from the new into the old channel." Matheson v. Ward, 24 Wash. 407, 64 P. 520, 521.

37. " * * * whatever rights David Lowery had to the land or the water * * * depended upon possession, and ceased with the relinquishment of possession without intent to resume. His right as an appropriator depended upon continued use, and, upon abandonment of the use of any part of the water, that part was subject to new appropriation." Smith v. Green, 109 Cal. 228, 41 P. 1022, 1024.

38. In an analogous case involving school lands reserved by the United States Gov-

ernment, the Court held that the Acts of July 26, 1866, 14 Stat. 251, 253, and July 9, 1870, 16 Stat. 217, 218, "are general in their application and apply to all government lands. * * * it was intended that rights in waters riparian to such reserved lands could be acquired by appropriation in the same manner that such rights were acquired in waters riparian to the public lands generally." State ex rel. Olding v. Stampfly, 69 Wash. 368, 125 P. 148, 150.

39. "The United States relinquished all of its rights to the nonnavigable waters of the Yakima river to the territory, and later the state, of Washington. The latter had the right to provide and did provide for the use of those waters and fixed the terms upon which the same might be used." Lawrence v. Southard, 192 Wash. 287, 73 P.2d 722, 728, 115 A.L.R. 1308. See Barker v. Sunnyside Valley Irrigation District, 37 Wash.2d 115, 221 P.2d 827.

40. Washington Session Laws of 1889–90, § 66, pp. 706, 728.

1902, required that the government should acquire water only in accordance with the laws of the states.[41]

But the administrative construction, upon which great weight is laid in modern times, is actually conclusive. The Indians did not insist upon such rights. Agent after agent held sway in the reservation and did not question the rights of the settlers. The Indians were in tutelage and the government agents did not possess the vision to appropriate the unused portions of the stream until the adventurers had proved what could be done with it. The awakening came about fifty years after the treaty, when the need for water on both sides of the stream became desperate. Thereupon, the Secretary of the Interior made a personal visit to the scene and entered into an agreement giving one-fourth to the Indians and three-fourths to the whites. But it is said the Secretary had no power to grant away property rights of the United States. We are of opinion that he did nothing but recognize the limitations set by practice upon the usage of water on the reservation and confirm the grants to the owners outside. Recognition was thereby given also to the fact that the government and the Indians were permitted by the territorial legislation to appropriate water in Yakima County and that the permission was renewed by the state enactment referred to. The government thereafter built a canal for the purpose of carrying and applying that portion of the flow so allotted to the Indians. In accordance with the terms of the agreement, masters to divide the water have been appointed year after year by the United States and the landowners north of the stream. Subsequently, the Secretary of the Interior, until the last few years, consistently has recognized these rights,[42] and Secretary Wilbur, as recently as 1930, indicated that he would stand fast by that agreement. With regard to the waters of the Yakima River, which likewise touch the reservation, the United States proceeded to appropriate them under the law of the state in 1905, according to the policy crystalized in the Reclamation Act.[43]

41. Act of June 17, 1902, 32 Stat. 388, 390, 43 U.S.C.A. § 391 et seq. Reclamation Act not only recognizes the law of the particular state, but requires Secretary to proceed in conformity. Burley v. United States, 9 Cir., 179 F. 1, 33 L.R.A., N.S., 807. "Certainly, the proviso in the Reclamation Act, 32 Stat. 388, that the Secretary of the Interior shall proceed in conformity with the water laws of the state argues an intention upon the part of Congress to act as did the individual proprietor, and Congress was undoubtedly well advised legally as to its lack of power to do otherwise." Byers v. Wa-Wa-Ne, 86 Or. 617, 169 P. 121, 417 Oregon Briefs 269, 351.

42. "They [these suits] are brought to enjoin the Secretary of the Interior from enforcing an order, the wrongful effect of which will be to deprive respondents of vested property rights not only acquired under Congressional acts, state laws and government contracts, but settled and determined by his predecessors in office." Ickes v. Fox, 300 U.S. 82, 96–97, 57 S.Ct. 412, 417, 81 L.Ed. 525.

43. Act of June 17, 1902, 32 Stat. 388. It is to be noted that, in dealing with the waters of the Yakima, which stand precisely in the same position as the waters of the Ahtanum, the proper officers of the Department of the Interior have made agreements for the use thereof and no question as to their validity or the right of the representatives of the Indian Service to do so has ever been raised.

On February 19, 1903, the then Superintendent of the Yakima Reservation made a water-right filing for 1,000 cubic feet per second of water from the Yakima River. Non-reservation water users, who had already appropriated almost the entire low-water flow of the river adversely to the reservation, commenced action in the courts of the State of Washington to enjoin the violation of their rights. At this point, the then Secretary of the Interior, E. A. Hitchcock, undertook to compromise all disputed claims to water rights to the Yakima River and allowed 147 cubic feet per second to the reservation as its low flow water right and an aggregate of 650 cubic feet per second to adverse claimants. This amount proved insufficient for the reservation, and, pursuant to the recommendations of the Joint Commission of 1913, Congress, in 1914, provided for a supply of water for about

The government agents encouraged the state in 1926 to proceed with the adjudication of the rights to three-fourths of the waters of the stream so long as there was no attempt to question the Indians' right to one-fourth or attempt to adjudicate the remainder. The United States was thus aware of the proceeding. The government was a party to the litigation in the sense that any rights claimed to that portion of the flow must have been asserted by landowners in that proceeding or they would be lost by judgment. The proceeding was one in rem. All parties had the right to assert their claims in the litigation. The state court had the right to adjudicate rights in rem. If the Indian wards or the government had any rights, these could have been asserted. If it had been desired, the proceeding could have been removed to a federal court or the government could have submitted any rights which the wards had to the state tribunal. The reason the government desired to stay clear of this proceeding was that it attempted an all-out defense of its position in relation to the same series of treaties in Oregon and was there defeated.[44] The proceeding of Washington was open and notorious and bound all the world. Rem. Rev.Stat. §§ 7351, 7373; The dissatisfied claimants took an appeal to the Supreme Court of the State of Washington. In re Ahtanum Creek, 139 Wash. 84, 245 P. 758.

The patentees from the United States then in the reservation did not assert any right to the waters of the Ahtanum beyond the amount which they were then using, and were therefore bound by the decree in that proceeding.[45] Besides, any of them who have permitted the patentees to use the waters of the stream on lands north of the boundary for a period of ten years have lost any right to object under the law of the state.[46]

The government agents have no more power or authority to question this decree in rem than if they had stood by when property to which the government had a claim was awarded by the state courts in interpleader.

In summary, certain conclusions are thus established. Where the United States has relinquished to a state all its rights to non-navigable waters, as was done by the acts above noted and the admission of the state to the Union, the state has the sovereign power to establish the terms upon which such waters may be appropriated The state recognized the right of appropriation in the

---

70,000 acres of land to be supplied from storage reservoirs constructed by the Bureau of Reclamation at no cost to the Indian. The Indian Service subsequently desired to secure a supply of water for the remaining 50,000 acres of irrigable land and entered into an agreement therefor known as the Joint Letter of March 31, 1921, approved by the Secretary of the Interior, with the Bureau of Reclamation. In 1936, the Indian Service desired to secure additional water, and again with the Bureau of Reclamation entered into a new agreement termed the Joint Letter of September 3, 1936, approved by the Secretary of the Interior, which also modified the 1921 agreement. Subsequent to the 1936 agreement, controversies arose between the Bureau and the Indian Service as to the proper interpretation of the 1936 agreement and the 1936 amendment to the 1921 agreement. As a result, there was issued a Joint Letter of Instructions dated June 21, 1938, signed by the Commissioner of Reclamation and the Commissioner of Indian Affairs and addressed to the Superintendent of the Yakima Reclamation Project and to the Project Engineer of the Wapato (Yakima) Indian Irrigation Project.

44. Byers v. Wa-Wa-Ne, 86 Or. 617, 169 P. 121, 417 Oregon Briefs 269–501. It is also to be noted that the United States, intervening in a suit in a state court to determine water rights, is bound by the decree. Pioneer Irrigation District v. American Ditch Association, 50 Idaho 732, 1 P.2d 196.

45. "The volume of the priority awarded a ditch in adjudication proceedings is res adjudicata, and the facts upon which such award is based, cannot be inquired into in a collateral proceeding." Rogers v. Nevada Canal Co., 60 Colo. 59, 151 P. 923, 928.

46. Rem.Rev.Stat. § 156.

arid lands in the eastern portion of the state and set up an elaborate system of administrative finding and judicial determination.[47] The right to waters of the Ahtanum beneficially used upon patented lands outside the reservation were under the jurisdiction of the state courts and have been fully and conclusively adjudicated under this statutory plan. The proceeding was quasi in rem and related to specific real property. It was local in character. All the world was warned to set up claim to water rights on the stream. By failing to set up a claim, the United States and each of the Indian wards is foreclosed now of any right thereto. In this regard, there is no paramount right of the United States.

The result is that the government has neither proved that it or any of the Indians has been ousted from the possession and use of the flow, nor has it so far proved by a preponderance of evidence that the Indian nation or the individual Indians had title and right of possession to any part of the water now being used by the whites. Although these conclusions are based upon the failure of its lawyers to put the foundations of title of the government in issue and thereby place the defendants upon notice as to the claims against which they would be required to defend, the result, even if final, would not shock the conscience.

For, even if some Indians have been stirred up, not entirely disingenuously, to claim this as another wrong perpetrated by the whites, the rights of the Indians are not really involved. Were the government to confess its agents had robbed the Yakimas [48] by failure to appropriate water for this land, there is today on the reservation sufficient unused waters to irrigate all the cultivatable land on the Ahtanum. It is true it cannot be shown that the application of this water is economically feasible because of the very high cost of application. But, if an ethical principle of fairness to a conquered and dependent people is involved, money considerations should not be weighed. There should be some morality in the dealings of the government agents. Even if the Indians are justly aggrieved, the government should not pursue a system of Indian-giving with the white owners off the reservation. It is not just to encourage them to spend more than a generation building communities on the basis of this water, and then arbitrarily confiscate it on the basis of a claimed reservation never expressed in words for almost a century.[49]

However, if it be determined that there are property rights of various individual Yakima Indians which have been violated by the use of water on lands off the reservation, then the government must put itself in a position where those claims can be defined, defended against and determined with clarity.

In order to have any relief, the government must state as to what lands the United States seeks to establish the

47. Rem.Rev.Stat. § 7351ff.

48. The unbounded confidence expressed by the Supreme Court in negotiators for the government has had to be modified. See Justice Douglas dissenting in Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, at pages 358, 361–362, 65 S.Ct. 690, 89 L.Ed. 985. The validity of claims for compensation under appropriate circumstances has been fully recognized. United States v. Alcea Band of Tillamooks, 329 U.S. 40, 67 S.Ct. 167, 91 L.Ed. 29.

But no compensation should be given the Indians at the expense of the whites who have purchased land titles from the government and have vested right. Another attempt to do this in which no Indians were involved is found in United States v. Otley, 9 Cir., 127 F.2d 988.

49. C. Horowitz, Riparian & Appropriation Rights to the use of water in Washington, 7 Wash.L.Rev. 197, 200.

In Broder v. Natoma Water & Mining Co., 101 U.S. 274, 25 L.Ed. 790, it was held that the rights of water appropriators on public domain, which the government by its conduct had recognized and encouraged, would be protected even without congressional legislation. In Isaacs v. Barber, 10 Wash. 124, 38 P. 871, 30 L.R.A. 665, it was held that the Act of July 26, 1866, protected appropriations of water made prior to the Act.

use of the entire flow of the Ahtanum as appurtenant. It has never been outlined anywhere as to whether the government intends to parcel out part of the flow to patentees on the reservation, and, if so, in what quantities and to what specific parcels. The attorneys for the government have never stated whether they recognized a distinction between use of part of this water by an Indian upon reservation lands as of a different quality from use by a white man on such lands before or after patent. If the whole flow of the Ahtanum is claimed for the Indians, it is a question as to whether the government recognizes a right in a white successor to an Indian holder of a trust patent who later has been permitted to patent and sell his allotment.

 There are some of these individual allotments held by trust patent which border upon the stream. It is a question whether the government claims such parcels have greater, less or equal rights with parcels far up on steep hillsides.[50] There were some of these parcels upon which appropriations of water were actually and beneficially applied at an early date.[51] There has been no statement as to whether it is contended such parcels have prior rights or only equal rights with parcels which were never irrigated until thirty years thereafter.

 Since the government cannot recover upon a claim of right of the Yakima Indian nation as an entity, but only as the trustee for several individual Indians who hold trust patents respectively, the claim of each respective owner must be specifically set up and proved, and further there must be proof of acts of some defendant or defendants which interfere with the trust owners of particular pieces of property, before the government can require any landowner north of the boundary to plead or prove his claim to ownership of a water right.

Further pre-trial conferences and trial, if need be, will be had to accomplish these purposes, if the government requests such action. If no motion is made within a reasonable time, the cause will be dismissed on the merits, since the government has failed to prove a water right reserved for any specific tract and has failed to prove that any of its wards have been injured by any defendant.

The appropriate record may be presented to the Court by defendants.

### Supplemental Opinion

The lawyers for the government demand clarification of the original opinion, pointing to some minor errors which have now been corrected. Throughout this case, these lawyers have been driven by a blind obsession that they could turn the clock back for one hundred years and take away from owners of land patented to them by the United States vested rights appurtenant to each parcel under the municipal law of the state without compensation.[1]

 This Court has consistently held, as was held in the opinion which these lawyers request the Court to explain to them, that water rights appurtenant to such lands could be questioned only by the owner of a particular parcel who alleged and proved affirmatively that he owned a water right prior in time and superior in right to that of

---

50. "The mere fact that a tract of land touches a stream at one point does not make such land riparian at other points on the stream, or to the whole of the stream. The riparian right of such land, or the owners thereof, is confined to the points where the land abuts upon the stream." Miller v. Baker, 68 Wash. 19, 122 P. 604, 605.

51. If there be any claim that there was actually more water appropriated for individual Indians before the Code agreement than the Indians are now receiving,

there may be a basis for adjudication. Likewise, it might be possible for certain several tracts held in trust for individual Indians to claim that such tracts are riparian to the stream and as such to claim such rights. Neither the pleading nor the pre-trial order make any such position clear.

1. See for similar persistent and unreasoning zeal United States v. Walker River Irr. Dist., D.C.Nev., 11 F.Supp. 158 and particularly United States v. Walker River Irr. Dist., D.C.Nev., 14 F.Supp. 10.

the one who has proved to have interfered with his enjoyment of the usufruct. Because such individual claims were neither pleaded, set forth in the pre-trial order, nor proved, the Court held that the patentees of lands outside the reservation on which water was being used were not required affirmatively to set up and prove their own claims.

It is axiomatic that, in all litigation over real estate, the plaintiff must recover on the strength of his own title. There are two advantageous aids. If plaintiff has title deeds which vest him with ownership in fee even if he be out of possession, or if, on the other hand, he claims ownership and is in actual possession, he may demand that the adversary allege and prove facts showing adverse claim.

This proceeding is not, as these lawyers seem to believe, of a kind with quo warranto brought by the Crown against these defendants for usurpation on the theory that nil tempus occurit regi and to lie rebutted only by affirmative and independent proof by muniments of a title unquestioned since the mind of man runneth not to the contrary and specifically to the time of the accession of Richard I, of glorious memory, in the year of Our Lord, 1187.

The lawyers for the government did not present a claim for any individual tract of land as trustee of the naked legal title for the equitable owners who are Indians. The body of lands have been allotted in severalty to respective Indian owners. Neither did they allege, claim or prove by written documents title to any specified water right appurtenant to a particular allotment. On the other hand, they did not plead, claim or prove possession by user and beneficial application of any defined water right on any allotment.[2]

Instead, although the theories have never been exactly defined, these lawyers seem to claim a water right for the entire body of irrigable land on the reservation in this watershed. Although this is disclaimed, such a pretension cannot be supported except as a claim to the entire flow of the Ahtanum for the entire body of reservation land. The basis of this claim is that the makers of the Treaty of 1855, signed by commissioners of the government and certain headmen of the confederated tribes, reserved the waters of the Ahtanum in perpetuity for whatever use might be devised for them in centuries to come. There is no doubt the United States, as owner and sovereign of the whole area, might have so reserved both the land and all the water. The Court held, in the opinion, that the language of the treaty would not bear such a construction. The Court held as a fact that no intention of the treaty makers which envisaged any application of water in quantities could be implied from the circumstances surrounding the creation of the reservation. The Court held that necessity would imply that the parcels touching the river bank be not deprived of water for cooking and domestic uses, irrigation of gardens and the watering of stock. No claim, however, was made on this basis for any parcel.

The lawyers for the government say they do not claim the entire flow of the stream, but only 4.4 acre feet per acre per annum for each acre of the entire body of irrigable land—in other words, nearly 22,000 acre feet—which is more water than the entire stream of the Ahtanum flows during any irrigation season. Again, the claimed basis of this afterthought is the Treaty of 1855. The

2. The government showed, as to each parcel involved herein, the date of allotment, the present owner, the number of acres irrigated and the date of first irrigation, the number of irrigable acres and the ditch or ditches serving each parcel. It set forth a claim of 4.4 acre feet for each irrigable acre. There is nothing in the record to establish the amount of water beneficially used on each parcel or the date of first use of any specified amount. Specifically, there is nothing in the record to indicate that 4.4 acre feet has ever been used beneficially on any acre within the reservation.

Court held that specific measurement of water for beneficial use on a parcel of land is a characteristic of the custom of miners developed in the gold fields of California in 1848. This miners' custom was not adapted for use in irrigating agricultural lands until some years thereafter.

■ The short answer to the proposition that water was appropriated for the use of this entire tract is that the doctrine of appropriation required continuous beneficial application of the corpus of the water upon the particular tract of land. No one pretends to say that any amount over one quarter of the flow of the Ahtanum was ever given application on any portion of this tract during all the hundred years since the treaty.[3] The lawyers for the government did not prove title to and did not prove possession of the corpus of the water at any time to give color to their present claim.

The Court held such an appropriation was not contemplated by the treaty makers in 1855. Long after and in 1866, the government first recognized the doctrine of appropriation as available against government rights. It is true that the doctrine of appropriation, after it was developed, protected a party who gave open and public notice of intention to appropriate a specific quantity of water and who within a reasonable time thereafter commenced works sufficient to carry the specified amount of water, and thereafter, also within a reasonable time, actually made beneficial application of the entire amount claimed to the body of land in question.

There was no such intention evinced by the treaty, as the previous opinion points out. There were only sporadic appropriations by individual Indians for the benefit of particular tracts before

the state was admitted to the Union. As noted above, there has never been use of the amount of water now claimed on the whole body of the reservation. Neither the United States nor the Indians have built works to this day which are capable of carrying the amount of water now claimed during the irrigation season.

■ Two events happened near the same time which negative the present claims of the agents. First, in 1889, the State of Washington was admitted to the Union. Second, after 1887, the bulk of the lands of the Yakima Indian Reservation were allotted in severalty.[4] The Court held, in the opinion, that Washington was admitted on an equal footing with the original thirteen states, and that, while the state must recognize vested rights, her people could enact a municipal law governing the fields of real property and water rights, which would be binding upon all, including the United States. Thereafter, except for rights vested before that date, water rights could not become appurtenant to lands to which even the United States held title unless the local statutes and law were followed. The government, as landowner, whether in its own right or as trustee of a particular tract for an individual Indian allottee, held under the same incidents as an individual owner of property in the state. The Court held that the government agents had neither reserved the entire flow, made an appropriation therefrom, nor evinced an intention of making an appropriation for the entire body of such lands before the state was admitted to the Union.

After the admission of Washington to the Union and the allotment of the lands in severalty, water rights could only become appurtenant to particular parcels thereof.

3. In order to bolster its claim, the government in recent years has split up the water to which certain allotments may have been entitled under the law of prior appropriation and has spread it over the entire area of irrigable land within the reservation.

4. The Act authorizing the allotment of lands within the Yakima Indian Reservation was passed in 1887, 24 Stat. 388. Allotment of such land was substantially completed in 1898.

By administrative acts, the government officers and agents negatived the broad claims now put forward. First, in 1908, after the state law was paramount as to water rights, a Secretary of the Interior, who was on the ground and was in possession of the facts, approved the allocation of the water of the Ahtanum three-fourths to the landowners off the reservation and one-fourth to the allottees of the reservation. Second, in 1925, the United States Attorney of the District acquiesced in the adjudication of the waters of the Ahtanum among the owners off the reservation provided there was no attempt to settle the priorities between them and the one-fourth of the flow which was being applied within the limits of the reservation.

The Court held such acts have important consequences. They show that there was no intention to make the claim here until a false construction of the Winters case awakened the power-grasping instincts of the bureaucrats. In addition, each was a definite administrative construction of the treaty and rights of the government, the Indians, and those patentees of lands outside the reservation, which cannot now be reversed.

The Court believes from the proof in the record that claims could be defined for many of these parcels under the riparian doctrine or under the theory of beneficial appropriation which the Court would enforce. Therefore, a further pre-trial conference was ordered in order to define these claims. The Court recognizes that, by their acts, the agents of the government may have prejudiced the claims of some of these parcels. It may be that riparian lands on the lower portions of the stream have acquiesced so long in the water being used elsewhere that their rights may now be lost. It is also indicated that the agents may have taken water rights in part from particular parcels which had a prior appropriation and given these to other parcels

which had no such rights. This was a violation of local law and a wrong to the individual ward, of which no trustee should have been guilty. The progressive enlargement of the system serving reservation lands after 1908, the addition of new ditches until 1915 at least and the successive new lands watered since 1908 with the same amount of water indicate abandonment by the United States and individual allottees of the right to water which has been beneficially used on other allotments.

The lawyers for the government realized the difficulty with their present position when they came to consider the situation of the patentees of what were formerly reservation lands. Such parcels were no longer in government ownership, but had been patented long after many of the lands outside the reservation. Likewise, some of them may have had early water rights. If these were included as plaintiffs, which was logical, the right enforced by the agents would not be a strictly Indian right. Besides, it would place these late buyers of land parcels in a favored position over the pioneer patentees direct from the government who had been beneficially applying this water for over sixty years in building an empire out of the wilderness. On the other hand, it could be claimed that the water right was strictly an Indian right which did not pass to a white purchaser. The dilemma has no solution. These subsequent transferees of Indian lands, of course, claimed by right of the original sovereignty of the government. But the lawyers for the government took no position. Therefore, the necessity for further pre-trial conferences is manifest.

If the lawyers for the government persist in the recalcitrant attitude and policy of obstruction which has been adopted all through the case, the complaint will be dismissed for want of prosecution.